

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00073-CV

TOMMY BARBER                                                          APPELLANT

V.

GINA KEAS                                                             APPELLEE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three issues, Appellant Tommy Barber argues that the trial court erred by granting a protective order to Appellee Gina Keas.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

Barber and Keas had known each other for three years and had been in a dating relationship during that time. Barber would often stay at Keas's home, he kept some of his clothes and personal belongings there, and for a month or two before Keas filed her application for a protective order against him, he had been staying with her, paying rent, and helping to pay bills.

On the evening of October 22, 2010, the parties argued after Keas reminded Barber of her schedule for the next day. Keas told Barber that she was going to work from 9 a.m. to 1 p.m., then help Strickland Junior High School with an "extreme school makeover," and then go to Bridgeport to see her mother, her twenty-two-year-old son Ryan, and her granddaughter. Barber told her that he did not believe her, that she was lying, that he would "just handle this [his] way," and that he would follow her.

The next morning, around 4 a.m., Barber woke Keas, said that he did not believe her, accused her of lying and cheating, and insisted that she call Ryan, who was at Keas's mother's house. After Keas called Ryan and woke him, Barber told her, "I don't think you just called him," and he acted very aggravated and agitated.

Keas got up and went into the kitchen for a soda. Barber got up too, and from the living room, he said, "[I]f this is the way it's going to be, I'm going to pack my stuff and leave." Keas replied, "Why don't you just do that." According to Keas, Barber came after her. She stated, "He came across the living room. He

2

grabbed me by the head of my hair [sic], he drug [sic] me into the living room, and basically the next thing I know is I woke up on the living room floor. . . . And he was over me."

When Keas regained consciousness, Barber was kneeling beside her with his hand on her head. He told her that he was sorry and asked if she was okay. Keas asked him if he could promise her that it would never happen again, and he said, "No, I can't promise you that if you—if you raise your voice at me." After they finished talking, she took a shower, got dressed, and went to work. After she told her coworkers what had happened, her supervisor called the police and reported the assault. At the time of the protective order hearing, Barber's criminal charge was still pending.

On October 29 or 30, Keas found a comment by Barber on Facebook that caused her concern for her safety. The comment was "[t]hat he would never— never intentionally put a person in a position to fail, but being put in that position, that he'll still be standing when the dust clears." Keas took this as a veiled threat.

Prior to the October assault, Keas did not recall any instances of physical violence, but she testified, "I remember we were at a club one time and I was talking to another gentleman and [Barber] got aggravated. And when he did, he grabbed me by the arm and said, 'Let's leave.'"

On the Monday before Christmas, Barber sent Keas a dozen red roses and a card on which "It[']s not very fun spending [Christmas] without the one that you love" was written and in which he told her that he was sorry, that it would

3

never happen again, and that he was sorry for losing his temper. The trial court admitted into evidence a photocopy of the card's message. Barber and Keas remained "friends" on Facebook, and she would occasionally check his status. Keas said there were other comments on Facebook that made her feel unsafe. On December 27, 2010, the State filed an application for a protective order for Keas, who received a temporary ex parte protective order against Barber pending the protective order hearing. Keas stated that Barber did not contact her in any way while the emergency protective order was in place.

At the protective order hearing, in addition to recounting the foregoing events, Keas stated that she believed a protective order was necessary to prevent violence between Barber and herself in the future. She also stated that she felt that Barber was capable of harming her and willing and able to harm her.

At the conclusion of the hearing, the trial court entered a protective order for Keas, to last for the shorter of two years or a finding of not guilty in the assault case. In the order, the trial court found that the parties had a dating relationship under family code section 71.0021, that family violence under family code section 71.0004 had occurred and was likely to occur in the future, that Barber had committed family violence, and that a protective order for Keas's protection should be entered under chapter 85 of the family code.[2] The order prohibited Barber, inter alia, from committing family violence against Keas, communicating

---

[2]The trial court also ordered Barber to attend a batterers' intervention program and counseling.

4

directly with Keas in a threatening or harassing manner, communicating a threat through any person to Keas, and going within 200 yards of her residence or place of employment. This appeal followed.

### III. Protective Order

In his first two issues, Barber complains that the trial court's finding that he was likely to commit future violence or harm to Keas is based on no evidence or legally insufficient evidence.[3] In his third issue, Barber argues that the trial court erred by misapplying the preponderance of the evidence standard imposed on Keas by determining, as its sole finding, that Barber was likely to commit violence because Barber presented no evidence that diminished the possibility of harm.

### A. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In

---

[3]These challenges are synonymous, so our disposition of Barber's first and second issues will be the same. *See Tex. Dep't of Pub. Safety v. Moran*, 949 S.W.2d 523, 525 (Tex. App.—San Antonio 1997, no writ).

determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

### B. Analysis

Under the family code, a court shall render a protective order if, after a hearing, it finds that family violence has occurred and is likely to occur in the future. Tex. Fam. Code Ann. §§ 81.001, 85.001(b) (West 2008). The record supports, and neither party disputes, the trial court's finding that family violence occurred.

When the record does not contain evidence specifically related to a person's likelihood of future violence, the central focus is whether evidence of past family violence will support a finding that future family violence is likely. *Dennis v. Rowe*, No. 02-10-00288-CV, 2011 WL 3546618, at *4–5 (Tex. App.— Fort Worth Aug. 11, 2011, no pet.) (mem. op.). And when there is evidence of only one incident of past family violence but there are other incidents that circumstantially support the trial court's finding that family violence is likely to occur in the future, the evidence is legally sufficient to support a finding that

6

family violence is likely to occur in the future. *Id.* at *5; *cf. Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 825 (Tex. App.—Fort Worth 2007, no pet.) (distinguishing *In re J.A.T.*, No. 13-04-00477-CV, 2005 WL 1981497, at *1 (Tex. App.—Corpus Christi Aug. 18, 2005, no pet.) (mem. op.)), *disapproved of on other grounds*, *Iliff v. Iliff*, 339 S.W.3d 74, 78–79 & n.2 (Tex. 2011).[4]

Here, prior to the assault, Barber accused Keas of lying to him and cheating on him and informed her that he would follow her. He woke her early the next morning and continued to tell her that she was lying to him before eventually dragging her by her hair into another room and rendering her unconscious. Immediately after the assault, Barber informed Keas that he could not promise her it would never happen again if she raised her voice at him. In addition to the assault itself, the trial court also heard about Barber's other pre-assaultive jealous behavior, and his post-assaultive Facebook comments, as well as the Christmas card in which he apologized, stated that the violence would never happen again, and said that he was sorry for losing his temper. Further, Keas testified that she believed a protective order was necessary to prevent violence between Barber and herself in the future and that she felt Barber was capable of harming her and willing and able to do so. Taking all inferences in favor of the trial court's finding, we conclude that there was more than a scintilla

---

[4]In *J.A.T.*, the court held that, assuming the act of pulling a child away from the other parent constituted family violence, it was insufficient evidence of the likelihood of family violence occurring in the future. 2005 WL 1981497, at *1.

of evidence that Barber would continue acting violently toward Keas in the future, and we overrule Barber's first and second issues. *See Dennis*, 2011 WL 3546618, at *5; *see also Islas*, 228 S.W.3d at 651; *Cazarez*, 937 S.W.2d at 450.

With regard to Barber's third issue, nothing in the record supports Barber's allegation that the trial court improperly shifted the burden of proof from Keas to Barber. Therefore, we overrule Barber's third issue.

## IV. Conclusion

Having overruled all of Barber's issues, we affirm the trial court's judgment.


BOB MCCOY
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: October 20, 2011